UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CIVIL ACTION |
| ex rel., WILLIAM ST. JOHN | | |
| LACORTE, M.D. | * | NO. 99-3807 |
| Plaintiffs | * | SECTION: "I" (4) |
| | * | |
| v. | | |
| | * | |
| MERCK & CO., INC. | | |
| | * | |
| Defendants | | |

\* \* \*

**UNITED STATES' MEMORANDUM OF LAW**

**INTRODUCTION**

The United States of America respectfully submits this Memorandum of Law to address

the following two issues raised by the Court in its Minute Entry of February 8, 2008 (Docket

Entry #159), and Order entered on February 13, 2008 (Docket Entry #160): 1) whether the Court

has discretion to adjust the relator's fee which has been agreed upon by the parties; and 2)

whether the Court may order an amount for relator's share below 15%.

As explained in detail below, it is the Government's position that once the United States

and relator have entered into a formal agreement on a relator's share that is within the applicable

statutory range, the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq., does not provide the

Court with discretion to adjust the amount agreed to by the parties.  Furthermore, because the

issue has been settled and because there is no dispute between the United States and the relator

over the amount of the award, there is no Article III case or controversy for the Court to decide

and, consequently, no further judicial role for the Court on that particular issue.[1]  Finally, the

applicable statutory range established by Congress for relator's share in cases of this type is a

minimum of 15% and a maximum of 25%.  Although the FCA does contemplate a lower range

of 0 to 10% in certain specified circumstances, i.e., when the relator planned or initiated the fraud

or when the allegations in relator's complaint are primarily based upon certain public disclosures,

those circumstances do not apply to the instant case.

 For the foregoing reasons, the United States respectfully requests that the Court not adjust

the relator's share agreed to by the parties in their Settlement Agreement.

### BACKGROUND

 The settlement in this case is the culmination of a coordinated, multi-agency, federal and

state investigation into Merck's pricing and reporting practices concerning the drug Pepcid.[2]

While the procedural history of this case is long and complex, a brief summary may assist in

placing the issues now before the Court in their proper context.

 The Government's investigation of Merck began in 1999, when relator,William St. John

LaCorte, filed an action under the qui tam provisions of the False Claims Act (FCA), 31 U.S.C.

§§ 3729-3733.  In his original complaint, LaCorte alleged, inter alia, that Merck concealed

market share discounts on Pepcid from Government programs and induced hospitals to switch

---

[1]  The United States expresses no view on the collateral dispute between LaCorte and his former counsel over the proper amount of attorney's fees payable by LaCorte under his representation contract with his former counsel.

[2]  The settlement in this case is related to an investigation of Merck into similar pricing practices involving the drugs Zocor and Vioxx in United States ex rel. Steinke v. Merck & Co., Inc., (E.D. Pa.) (Steinke).  Simultaneously with this case, the United States, the States, and Merck entered into settlement agreements in Steinke, in which Merck agreed to pay $399 million to resolve pricing and kickback allegations relating to these and other Merck drugs.

prescriptions from other drugs to Pepcid, driving higher beneficiary usage on an outpatient basis

at inflated payment levels.  In January 2003, the Government informed the Court that it was not

intervening at that time, and the matter was unsealed.  Merck subsequently filed a motion to

dismiss, which the district court granted in part and denied in part, but granted LaCorte leave to

amend.

On August 2, 2004, LaCorte filed his First Amended Consolidated Complaint under seal,

alleging, inter alia, that Merck violated the Medicaid Rebate Statute, 42 U.S.C.§ 1396r-8, and

Rebate Agreement by failing to report deeply discounted prices offered to hospitals under a

pricing arrangement known as the FLEX NP (Nominal Pricing) Program for Pepcid.[3]

Under the Medicaid Rebate Statute and Rebate Agreement, manufacturers such as Merck

whose drugs are covered by Medicaid must report certain pricing information to the Centers for

Medicare and Medicaid Services (CMS), including the Average Manufacturer's Price (AMP) and

for certain drugs, including the Pepcid formulations, their lowest or Best Price.  See 42 U.S.C.

§ 1396r-8(b)(3)(A).  These prices are then used to calculate a rebate that the manufacturer must

pay to each state Medicaid Program for that drug, so that Medicaid effectively receives the

benefit of the lowest price or Best Price.  See 42 U.S.C. § 1396r-8(b)(1)(A); Rebate Agreement

at § II(a).  Thus, if a manufacturer misstates its Best Price (i.e., reports a higher Best Price than

one that it actually offered), it would improperly reduce the amount of rebate payable to each

---

[3] LaCorte further alleged violations of: 1) the Anti-Kickback Statute as a result of
inducements created under the FLEX Program as a whole; 2) the Food Drug and Cosmetic Act
(FDCA) by causing and promoting exclusive formulary placement or auto substitution policies
and by causing a drug to be dispensed without a valid prescription by the pharmacist; 3) the
FDCA based upon allegedly false statements in Package Inserts and promotional materials; 4) the
False Claims Act based upon an underlying violations of State Medical Practice Acts; 5) the
1994 Special Fraud Alert on drug switching.

state Medicaid Program.

Because the underpayment of rebates potentially affected each state Medicaid Program, the investigation of Merck became national in scope. The National Association of Medicaid Fraud Control Units (NAMFCU) established a team of law enforcement units to assist in the investigation as did the Department of Health and Human Services, Office of Inspector General (HHS-OIG). One of the principle areas of investigative focus was whether hospital purchases of the various formulations of Pepcid (Tablets, Intravenous, and Oral Suspension) under the FLEX NP Program constituted "bundled sales" or fell within a statutory exception to the Best Price reporting requirement for prices that are "merely nominal" in amount. See 42 U.S.C. § 1396r-8(c)(1)(C)(ii). This required a painstaking review of hundreds of thousands of pages of internal Merck documents and Examinations Under Oath (EUOs) of key Merck current and former employees. Although relator LaCorte was neither a Merck employee nor an insider, his former counsel provided substantial material assistance to the Government team and its investigation while serving as LaCorte's counsel.

On September 17, 2007, pursuant to 31 U.S.C. § 3730(b)(2) and (4), the United States filed a notice of intervention. The United States was joined by the States of California, Nevada, Florida, Illinois, Massachusetts, Delaware, Texas, and the District of Columbia. Shortly thereafter, the Court issued an order maintaining the seal and granting the United States and the States until Monday, October 1, 2007, to file their own complaint.

On Friday, September 28, 2007, after extensive negotiations involving multiple proposals, the United States, the States and Merck reached an understanding on a framework for settlement of the action, and notified the Court. The understanding called for Merck to pay $250

million to resolve its potential liability under the FCA arising out of the FLEX NP Program, plus

interest to begin accruing from October 28, 2007.  To allow the parties time to draft and finalize

the terms of their settlement agreements, the Court granted a series of further extensions of the

seal up to an including February 19, 2008.

During that time, the United States, the States (through the NAMFCU), relator's former

counsel, and Merck worked diligently to resolve the myriad of open issues and gain the requisite

approvals from a multitude of entities.  Those issues included but were not limited to the

federal/state split of the recovery, the precise scope of the covered conduct to be released, the

relator's share to be awarded by the United States under the FCA, the relator's share to be

awarded by the various states under their respective qui tam statutes, and the attorney's fees to be

paid by Merck to relator's counsel.

After reaching agreement with the States on the federal/state split of the overall recovery

($137,500,000 (federal) /$112,500,000 (states)), the United States informed relator and his

counsel of the amount it was prepared to pay relator as his share.  Under 31 U.S.C. § 3730(d)(1),

the possible range in this case was a minimum of $20,625,000 (15% of the Federal Settlement

Amount) to a maximum of 34,375,000 (25%).  In light of the assistance provided to the

Government by LaCorte's former counsel, the United States offered LaCorte the flat sum of

$24,062,500, which translates to 17.5% of the Federal Settlement Amount of $137,500,000.[4]

LaCorte agreed, and the figure of $24,062,500 was incorporated into the Federal Settlement

Agreement, which was subsequently executed by the United States, Merck, and Relator and

---

[4] Similarly, the States collectively offered LaCorte the aggregate sum of $10.9 million as
relator's share from the recoveries due to each state with a qui tam statute.  This figure also
translated into a 17.5% share from the recoveries of those states with qui tam statutes.

became effective on February 6, 2008.

In light of the Federal Settlement Agreement, on February 7, 2008, the Court issued an

Order granting the joint request of the United States and LaCorte to dismiss this action with

prejudice as to the relator, and with prejudice to the United States as to the Covered Conduct, but

without prejudice as to all other claims.  The Court issued a similar order of dismissal with

respect to the pendent state claims brought by the States under their respective qui tam statutes.

Notwithstanding the settlement and dismissal of the underlying action, the Court has requested

briefing on the two issues identified above, and has ordered the United States, the States, and

Merck to remit the amounts payable to relator under their respective settlement agreements into

the registry of the Court.

**ARGUMENT**

A.      Once the United States and Relator Have an Agreement on Relator's Share, the
        Court Lacks Independent Authority to Review the Award

Once an agreement in principle has been reached with a defendant in an action brought

under the qui tam provisions of the FCA, it has been the long-standing policy and practice of the

United States to negotiate with relator over the amount of the award, based upon an assessment

of "the extent to which the [relator] substantially contributed to the prosecution of the action."

31 U.S.C. § 3730(d)(1).[5]  If those negotiations are unsuccessful, the relator may submit the issue

to the Court for a determination, and in that circumstance, there clearly is a concrete dispute for

_____

[5]  The Department of Justice has developed internal guidelines and identified a series of
factors to inform its decision regarding an appropriate amount for relator's share.  Furthermore,
the amount offered to a relator must be formally approved by senior officials within the
Department of Justice.  In this matter, given its size, the amount of the award was formally
approved by the Assistant Attorney General for the Civil Division.

the Court to decide. If, however, the United States and relator reach agreement on an award that

is within the applicable statutory range, there is no legal basis for the Court to independently

review and alter the amount agreed to by the parties. This position is based upon a textual

analysis of the specific statutory provision governing awards to qui tam plaintiffs and well-

established constitutional principles that limit the exercise of judicial power under Article III to

actual "cases or controversies" between the parties.

> 1. The FCA Does Not Give the Court Plenary Authority to Alter an Agreement Between the United States and Relator on the Amount of the Award

Awards under the FCA to a qui tam plaintiff are governed by 31 U.S.C. § 3730(d).

Paragraph 1 of Section 3730(d) governs the situation when the Government proceeds with an

action brought by a qui tam plaintiff, i.e., when the Government elects to intervene.[6] The first

sentence of Section 3730(d)(1) provides in relevant part:

> (1) If the Government proceeds with an action brought by a person under
> subsection (b), such person shall, subject to the second sentence of this paragraph,
> receive at least 15 percent but not more than 25 percent of the proceeds of the
> action or settlement of the claim, depending upon the extent to which the person
> substantially contributed to the prosecution of the action.

As is plainly evident, nothing in this statutory language confers upon the Court the role of

deciding relator's share. Rather, under the authority of Section 3730(d)(1), the United States

routinely enters into agreements with relators regarding the amount of the award, without

---

[6] Subparagraph 2 governs the situation when "the Government does not proceed with an action," i.e., when the Government elects to decline. Subparagraph 3 addresses the situation of an action brought by a qui tam plaintiff who the Court finds "planned and initiated the violation of section 3729 upon which the action was brought[.]" Finally, subparagraph 4 addresses the award of attorney fees to a defendant who prevails against a relator in a declined case under certain specified circumstances.

subjecting those agreements to court approval.  Nor does the statutory language cited above

require judicial approval of an agreement reached between the United States and relator over

relator's share.[7]

The fact that the statute authorizes a range of between 15% to 25% does not confer

authority upon the Court to disregard an agreement between the parties on the issue of relator's

share.  Rather, it simply provides the Government with the necessary statutory authorization to

make a payment of a relator's share within the specified range.  Without such authorization, the

Government could not make any payment for relator's share.  See Office of Personnel

Management v. Richmond, 496 U.S. 414, 416 (1990) (holding that payments of money from the

Treasury are limited to those specifically authorized by statute).  Thus, nothing in the language

cited above provides authority for the Court to exercise plenary review over an agreement

between the United States and the relator on the issue of relator's share.

This is underscored by the fact that, when the FCA contemplates a role for the Court, it

says so explicitly.  For example, if the Court finds the FCA action to be "primarily based" on

disclosures of certain types of information, Section 3730(d)(1) explicitly states that "**the court

may award such sums as it considers appropriate**, but in no case more than 10 percent of the

proceeds**, taking into account the significance of the information and the role of the person

---

[7] The absence of statutory language giving the Court plenary review over a settlement
agreement distinguishes the FCA from other statutory schemes or settlement agreements that
explicitly contemplate approval by the Court.  See e.g., Fed. R. Civ. P. 23(e)(1)(A) (in class
actions, "[t]he Court must approve any settlement, voluntary dismissal, or compromise of the
claims, issues or defenses of a certified class").  Yet, even when this authority is explicitly
granted, the Supreme Court has held that "the power to approve or reject a settlement negotiated
by the parties before trial does not authorize the court to require the parties to accept a settlement
to which they have not agreed."  Evans v. Jeff D., 475 U.S. 717, 726 (1986).

bringing the action in advancing the case to litigation." 31 U.S.C. § 3730(d)(1) (emphasis added).  Similarly, if the Court finds that the relator "planned or initiated" the fraud, Section 3730(d)(3) specifically states that "**the court may, to the extent the court considers appropriate,** reduce the share of the proceeds of the action which the person would otherwise receive . . . ." 31 U.S.C. § 3730(d)(3).[8]

It is significant that when reducing relator's share below the 15% statutory minimum, Congress plainly contemplated a role for the Court by including particular language explicitly referencing the Court's involvement and discretion.  Yet, it is equally significant that Congress omitted from the first sentence of Section 3730(d)(1) any reference to the Court's role in determining relator share in the first instance or when the Government and relator have reached agreement.  "When 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  Barnhart v. Sigmon Coal Co., 534 U.S. 438, 452 (2002) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)).  Thus, by explicitly contemplating a role for the Court when reducing the award in certain specified circumstances, yet omitting any reference to the Court's role in determining a share between 15% and 25%, Congress plainly did not contemplate a role for the Court when the United States and relator reach agreement on a share within the applicable range.

---

[8]  It is noteworthy that the Court's role in reviewing settlements under the FCA is narrow and arises only when the United States settles a case over the objection of a proper relator.  See 31 U.S.C. § 3730(c)(2)(B).  In that circumstance, the FCA authorizes the Court to hold a hearing, and to evaluate whether a settlement is fair, adequate and reasonable.  By limiting review of the merits of a settlement to this circumstance, the FCA makes clear that trial courts do not have a plenary right to assess the merits of any and all FCA settlements.

2.       There is No Article III Case or Controversy Between the Parties for the
         Court to Decide the Relator's Share Issue

This conclusion is reinforced by the well-established principle that settlement of a dispute

between parties renders moot any case between them, leaving no Article III case or controversy

for the Court to decide.  See In Re Talbott Big Foot, Inc., 924 F.2d 85, 87-88 (5th Cir. 1991);

In the Matter of S.L.E., Inc., 674 F.2d 359, 364 (5th Cir. 1982);  ITT Rayonier, Inc. v. United

States, 651 F.2d 343, 345 (5th Cir. 1981).  For a justiciable controversy to exist, "there must be an

adversarial relationship between the parties as to the question and the judicial process must be

capable of adjudicating it."  In Re Talbott, 924 F.2d at 87.  "Essential to the concept of a

controversy, under Article III, is an ongoing adversarial posture between the parties before the

Court."  In Re S.L.E., 674 F.2d at 364.  As explained by the Fifth Circuit in In Re S.L.E.,

> All models of cases and controversies assume the presence of at least two
> genuinely adversary parties.  Adversariness is desired both to establish the need
> for adjudication, and to provide the foundation for sound adjudication.  Judicial
> power is not exercised to offer advice to a single party, **nor to confirm the
> wisdom of private settlements already reached and honored.**  Nor is judicial
> power exercised when courts doubt the existence of sufficient adversary interest to
> stimulate the parties to a full presentations of the facts and arguments, which in
> our adversary system is available only from the parties.

Id. (emphasis added).   Thus, in In Re S.L.E., the Fifth Circuit held that in light of a compromise

settlement and dismissal of the underlying litigation with prejudice, there was no "justiciable

dispute presented between the parties" and, therefore, it had no jurisdiction to entertain an appeal.

See id.

Similarly, in this case, there simply is no live controversy between the United States and

relator over the issue of relator's share.  The United States and LaCorte have entered into a

formal agreement on that issue, have exchanged mutual releases, and have dismissed the

-10-

underlying action in accordance with the terms of that agreement.  Therefore, there is no concrete

dispute between the United States and relator that places them in a genuinely adversarial posture

– the very prerequisite to a case or controversy under Article III.  Thus, to the extent the Court

now seeks to address the issue of relator's share in the absence of an Article III case or

controversy between the United States and the relator, it would be exercising powers beyond

those granted to it under the Constitution.  In Re Talbott, 924 F.2d at 87 ("[t]he Constitution

limits the exercise of judicial power to 'cases' and 'controversies'").

Nor may the Court rely upon the FCA to decide the issue of relator's share, in the absence

of a concrete dispute between the parties.  As definitively declared by the Supreme Court, "no

statute could authorize a federal court to decide the merits of a legal question not posed in an

Article III case or controversy."  U.S. Bancorp Mort. Co. v. Bonner Mall Partnership, 513 U.S.

18, 21 (1994).

Because there is no Article III case or controversy, the United States respectfully requests

that the Court not alter the amount of relator's share agreed to by the parties and set forth in the

Federal Settlement Agreement.

> 3.    The Relator's Share Awarded by the United States is Appropriate Under
>        the Circumstances and In Comparison to Other Awards

Even though there is no justiciable case or controversy and without in any way conceding

that the Court has jurisdiction to review and alter the amount of the award, the United States

nonetheless wishes to assure the Court that careful consideration was given to the amount of the

award.  The amount of the award, $24,062,500, translates to 17.5% of the Federal Settlement

Amount of $137,500,000 recovered by the Federal Government and is at the lower end of the

15% to 25% range established by Congress.

This is an appropriate percentage in light of the criteria used in determining relator's share.  LaCorte did not participate in any of the wrongdoing; did not delay in filing his complaint; observed the seal obligations; supported the settlement negotiated by the Government and worked with Merck on counsel fees that are reasonable.  LaCorte was not, however, a classic "insider" with specific knowledge about the FLEX NP Program.  Rather, he was a doctor who served on hospital Pharmacy and Therapeutics committees and who objected to the hospital's adoption of the FLEX NP Program because he felt the market share requirements interfered with his ability to prescribe drugs that he felt were in his patients' best medical interests.

While LaCorte may not have assisted the Government in developing its legal theory, the efforts of his former counsel were substantial and accrued to the benefit of the Government while he served as LaCorte's counsel.  After the Government did not proceed with the action in 2003, and following an initial round of dispositive motions filed by Merck, LaCorte's former counsel prepared a detailed amended complaint in which he articulated the "bundling" claim.  LaCorte's former counsel cooperated extensively with the Government team to review the hundreds of thousands of pages of documents and to prepare the case for litigation.  LaCorte's former counsel maintained a reasonable negotiating posture during protracted settlement discussions with Merck and played an integral part in its eventual outcome.

When the Government reached an understanding on a framework for settlement with Merck, LaCorte immediately agreed in writing that the proposed settlement amount was fair, adequate, and reasonable.  He also reached a reciprocal agreement not to make any attempt to intervene or seek any share of the settlement proceeds in Steinke, thus cooperating with the

Government in obtaining a global settlement.

In light of the foregoing, an award of $24,062,500, or 17.5% of the Federal Settlement Amount, is appropriate and well in line with awards given in other cases of this type and magnitude. For example, the award in the related <u>Steinke</u> case in the Eastern District of Pennsylvania is over $44.69 million or 20.5% of the Federal Settlement Amount of $218 million. In a comparably-sized settlement involving the drug company Schering in 2004, the award was $31,662,174 or over 19% of the Federal Settlement Amount of $165,274,492. In a settlement involving the drug company Serono Laboratories in 2005, the award was $51,863,000 or approximately 17% of the Federal Settlement Amount of $305,077,000. Most recently, in a settlement involving the drug company Bristol-Myers-Squibb, the award was over $50,000,000 or 16.5% from a Federal Settlement Amount of $303,000,000.

Finally, were the Court to alter the terms of the Settlement Agreement and impose an award other than the amount agreed to by the United States and LaCorte, it would set an onerous precedent that could have unfortunate and unintended consequences. While in this case the Court may be inclined to reduce the award, a court in this or any other district may well believe that the relator should receive the statutory maximum. Relators could attempt two bites at the proverbial apple by negotiating one amount with the Government and then, despite an agreement, seeking judicial intervention if the court were perceived to be sympathetic to the relator. Not only would such an outcome needlessly add to the court's already congested docket, but it would enable a court to ignore the settled expectations of the parties to a negotiated agreement and impose its own judgment for that of the parties. The United States respectfully urges this Court not to set such a precedent.

       B.        <u>The FCA Does Not Authorize a Relator's Share Below 15% in This Case</u>

Because the United States filed a notice of intervention, the award in this case is governed by 31 U.S.C. § 3730(d)(1).  This provision states that "[i]f the Government proceeds with an action brought by a person under subsection (b), such person **shall**, subject to the second sentence of this paragraph, **receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim**. . . ."  The use of the word "shall" denotes a mandatory command, "which normally creates an obligation impervious to judicial discretion." <u>Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>, 523 U.S. 26, 35 (1998).  Thus, by using the phrase a "person shall . . . receive at least 15% but not more than 25%," Congress plainly intended to establish both a floor and ceiling for such awards.  While this statutory command is "subject to" the second sentence of this paragraph, this exception is inapplicable.

The exception only applies when the Court finds the <u>qui tam</u> action to be based primarily on specific disclosures of information in certain types of proceedings or in the news media.  <u>See</u> <u>United States ex rel. Merena v. SmithKline Beecham</u>, 205 F.3d 97, 105 (3d Cir. 2000) (the "lesser range (up to 10% of the proceeds) is provided for the (presumably unusual) cases in which an 'original source' relator asserts a claim that is 'primarily based' on information that has been publicly disclosed and that the relator did not provide").  This exception is wholly inapplicable to the instant case, as no one has even remotely suggested that the instant action is "primarily based" on information that was previously disclosed.

The only other statutory basis for a reduction in the award is set forth in 31 U.S.C. § 3730(d)(3), which applies to a relator who "planned and initiated the violation of section 3729 upon which the action was brought."  Plainly, LaCorte does not fall into that category.

**CONCLUSION**

For the foregoing reasons, the United States respectfully suggests that the Court lacks the

authority to review or alter the amount of the award agreed to by the United States and relator

and incorporated into the Federal Settlement Agreement.

Dated:

Respectfully Submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General


JIM LETTEN
United States Attorney


/s/ SHARON D. SMITH
SHARON D. SMITH (Bar No. 17146)
Assistant United States Attorney
United States Attorney's Office
Hale Boggs Federal Building
500 Poydras Street, Room B210
New Orleans, Louisiana 70130
Telephone: (504) 680-3004
Email: sharon.d.smith@usdoj.gov


JOYCE R. BRANDA
DANIEL R. ANDERSON
SANJAY M. BHAMBHANI
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-0546
sanjay.bhambhani@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this ___21st___ day of February, 2008, the foregoing was filed

with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic

filing to the following:

Harry Rosenberg harry.rosenberg@phelps.com, foya@phelps.com
E. John Litchfield jlitchfield@berriganlaw.net, cdaste@berriganlaw.net
Paul Stuart Weidenfeld paul.weidenfeld@usdoj.gov, jerrilyn.dufauchard@usdoj.gov,
rosanne.alford@usdoj.gov
Sharon Denise Smith sharon.d.smith@usdoj.gov, jerrilyn.dufauchard@usdoj.gov,
rosanne.alford@usdoj.gov
Todd Robert Slack todd@ghwlaw.net
J. Marc Vezina jmv@vezinagattuso.com, dhunter@vezinagattuso.com, mail@vezinagattuso.com
Sherif K. Sakla ssakla@lawmedic.com, saklalawfirm@lawmedic.com
William M. Ross wmr@sfr-lawfirm.com, rrm@sfr-lawfirm.com
Andrew P. Rittenberg arittenberg@cov.com
William S. Stone billstone@stonelaw.com, charlottenash@stonelaw.com
David William Boone david.boone@dwboonelaw.net, karen.peisel@dwboonelaw.net


/s/ SHARON D. SMITH
Sharon D. Smith (Bar No. 17146)